UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
WILLIAM S. KOLOGY AND
LINDA W. KOLOGY,                                          Chapter 13
            DEBTORS.                        Case No. 12-14992-WCH

_____

**MEMORANDUM OF DECISION**

## I. <u>INTRODUCTION</u>

There are various pleadings before the Court which have been consolidated into a single

contested matter.[1]  The Court conducted a trial on the contested matter on June 7, 2013, at which

time five witnesses testified and forty-four exhibits were admitted into evidence by agreement of

the parties.[2]  The question presented by the various motions and objections is to what extent are

William and Linda Kology (the "Debtors") entitled to claim an exemption in real estate located

in Harwich, Massachusetts pursuant to the Massachusetts Homestead Statute as being land on

---

[1] These matters include: the "Objection to Debtors' Homestead Exemption by Judgment Creditor, Todd H. Perry," Docket No. 15; the "Debtors' Memorandum in Opposition to Objection of Todd Perry to Claim of Homestead Exemption," Docket No. 26; the "Debtors' Motion to Avoid Judicial Lien of Todd H. Perry Pursuant to 11 U.S.C. §522(f)," Docket No. 31; the "Opposition of Todd H. Perry to Debtors' Motion to Avoid Judicial Lien," Docket No. 55; the "Debtors' Motion to Avoid Judicial Lien of Boston Financial Corporation Pursuant to 11 U.S.C. §522(f)," Docket No. 59; the "Debtors' Motion to Avoid Judicial Lien of CACH, LLC Pursuant to 11 U.S.C. §522(f)," Docket No. 60; the "Debtors' Motion to Avoid Judicial Lien of Capital One Bank (USA) NA Pursuant to 11 U.S.C. §522(f)," Docket No. 61; the "Debtors' Motion to Avoid Judicial Lien of Unifund CCR Partners Pursuant to 11 U.S.C. §522(f)," Docket No. 62; the "Objection of Judgment Creditor, Todd H. Perry, to Confirmation of Debtors' First Amended Chapter 13 Plan," Docket No. 76; the "Objection of Paul J. Cuddy, Jr. to Debtors' Proposed Amended Chapter 13 Plan," Docket No. 80; the "Debtors' Memorandum in Opposition to Objection of Todd Perry to Confirmation of Amended Chapter 13 Plan," Docket No. 81; the "Debtors' Objection to Claims and Notice to Claimants," Docket No. 172; the "Response of Todd H. Perry to Debtors' Objection to Claim #9," Docket No. 183.

[2] Notwithstanding any lack of express reference below, I have reviewed the entire record, including the docket of this case, *see In re Hyde*, 334 B.R. 506, 508 n.2 (Bankr. D. Mass. 2005) (a court may take judicial notice of its own records), all forty-four exhibits in evidence, and the trial testimony of each of the five witnesses.  Information that is ultimately irrelevant to my determination of these matters and would serve only to further complicate and confuse matters has been intentionally omitted and does not suggest a lack of consideration.  To the contrary, upon consideration of the entire record now before me, the following constitutes my findings of fact pursuant to Fed. R. Civ. P. 52(a)(1), made applicable to contested matters by Fed. R. Bankr. P. 7052 and Fed. R. Bankr. P. 9014(c).

which their principal residence is located.[3]   For the reasons set forth below, I find that the

Debtors' homestead exemption is limited to the subdivided lot that their house sits upon and will

enter orders consistent with that finding.

## II. BACKGROUND

The present dispute involves approximately fifteen acres of real estate located at 57

Round Cove Road in Harwich, Massachusetts (the "Property").   The following diagram, which

was admitted into evidence as Exhibit 5, is a perimeter plan of the Property prepared by an

engineer in August of 1989.   It fairly and accurately depicts the borders of the Property as the

parties understood them to be from approximately 1969 to 1989.[4]



---

[3] *See* Mass. Gen. Laws ch. 188, § 1 *et seq.*

[4] *See* Ex. 5 (arrows and labels added).

The Debtors acquired their interest in the Property by two quitclaim deeds.  The first, dated January 17, 1969, reflects a conveyance from Anthony J. Corchia and Eileen Corchia to the Debtors (the "Corchia Deed"), while the second, dated March 23, 1970, originated from Hitty Roxanne Coffin and Desmond Sanford Eldredge (the "Coffin Deed").[5]  Both the Corchia Deed and the Coffin Deed were recorded in the Barnstable Registry of Deeds.[6]

The Debtors found the Property through a real estate broker.[7]  After visiting the Property, they decided to purchase it.[8]  Before doing so, Mr. Kology and a co-worker with experience with land surveying walked the perimeter of the land and found the boundary markers.[9]  They financed the purchase, and a title examination was done which revealed no problems.[10]  Nevertheless, it is now undisputed that the Coffin Deed and Corchia Deed only conveyed a 25% interest in a portion of the Property.[11]

As reflected in Exhibit 5, reproduced above, the Debtors' house is near the northern border of the Property off Round Cove Road.  The southern two-thirds of the Property is largely dense forest which has become overgrown with the passage of time.[12]  For this reason, the undisputed evidence adduced at trial is that the Debtors' use of the Property has always been

---

[5] Joint Pre-Trial Statement ("JPTS"), Docket No. 129 at ¶ 29; Exs. 1, 2.

[6] *Id.*

[7] Trans. June 7, 2013 at 75:1-3.

[8] *Id.* at 75:4-10.

[9] *Id.* at 75:11-18.

[10] *Id.* at 77:9-14; 78:3-9; Ex. 4.

[11] JPTS at ¶ 30.  As will be discussed further below, this statement does not mean to suggest that the Debtors have an interest in all of the Property as depicted above.

[12] Trans. June 7, 2013 at 29:16-24; 54:2-4; 56:14-18; 57:1-7; 62:1-10; 83:7-24.  The testimony at trial suggests that at one time there may have been a narrow path along the eastern border of the Property which was amenable to horseback riding that has since become impassable.  *Id.* at  29:25; 30:1-6; 85:12-25; 86:1-22; 87:2-5; 109:9-16; 111:2-10; *but see id.* at 49:2-5; 53:24-25; 54:1; 56:19-25; 61:16-18; 62:1-24.

largely confined to the northern third within a few hundred feet of the house.[13]  Indeed, the only

activity that the Debtors engaged in that may have encompassed the entire Property is hunting.[14]

The Debtors were first alerted to the fact that their title to the Property was incomplete at

some point in the 1980s when they received a letter from Attorney Herbert Roberts of Chatham,

Massachusetts.[15]    Attorney Roberts discovered the title defect while performing a title

examination of the adjacent land owned by Paul J. Cuddy, Jr. ("Cuddy"), a developer who has

owned properties in the area since 1963.[16]    Cuddy requested the title examination after a

construction company, for reasons not relevant here, entered his land, removed the monuments

and boundary markers, and began selling the gravel.[17]    Upon receipt of Attorney Roberts' letter,

Mr. Kology "d[id]n't believe it," explaining that "[they] had bought it.    [The title examination]

had been done by the bank.  Our lawyer had had it done, and it was okay."[18]

Notwithstanding the potential title problem, the Debtors obtained a new subdivision plan

from an engineer on April 26, 1990 (the "1990 Subdivision Plan").  The 1990 Subdivision Plan,

which was admitted into evidence as Exhibit 6, is reproduced in relevant part below.[19]

---

[13] *Id.* at 10:16-19; 11:7-9; 14:11-21; 17:3-11; 20:8-15; 26:18-25; 27:1-17; 73:7-24; 84:5-17; 85:4-8; 87:9-19; 89:14-18; 121-122.

[14] *Id.* at 105:11-25; 106:1-18.

[15] *Id.* at 53:6-7; 79:2-11.

[16] *Id.* at 52:7-11; 53:1-4.

[17] *Id.* at 53:1-6; 60:15-24; 61:10-15.

[18] *Id.* at 79:5-11.

[19] Ex. 6 (labels added).



As can be seen from the diagram, the 1990 Subdivision Plan created two new lots, Lot 1 and Lot

2, off Round Cove Road to the west of the Debtors' house and designated the remainder of the

Property as Lot 3.  The 1990 Subdivision Plan did not require approval and was duly recorded.[20]

Mr. Kology testified that the purpose of the 1990 Subdivision Plan was to sell lots to

Todd H. Perry ("Perry") and John and Amy Jo McGillen (the "McGillens").[21]  By quitclaim deed

dated June 27, 1990, the Debtors conveyed Lot 1 to Perry.[22]  Thereafter, the Debtors deeded Lot

---

[20] JPTS at ¶ 33.

[21] Trans. June 7, 2013 at 78:16-18; 80:17-20.  I note that in the transcript, the name "McGillen" appears incorrectly as "McQuillan."

[22] Ex. 9.  *See* Trans. June 7, 2013 at 7:7-17.

2 to the McGillens on September 4, 1990.[23]  Perry constructed a house on Lot 1 in 1995 and has

lived there ever since.[24]  No house was ever built on Lot 2, and Perry subsequently acquired the

McGillens' interest.[25]

In 1992, the Debtors again retained an engineer to prepare a further subdivision plan (the

"1992 Subdivision Plan").  The 1992 Subdivision Plan, which was admitted into evidence as

Exhibit 7, is reproduced in relevant part below.[26]



---

[23] Ex. 10.  *See* Trans. June 7, 2013 at 8:19-21.

[24] Trans. June 7, 2013 at 7:4-6; 7:18-25; 8:1-11.

[25] *Id.* at 8:12-18; 8:23-25; 9:1-2.

[26] Ex. 7 (labels added).

The 1992 Subdivision Plan has a number of notable attributes. First, it defines the area around the Debtors' house as Lot 4 and sets its boundaries. Second, it contemplates the creation of a cul-de-sac known as Micah Drive off of Round Cove Road to provide access to the land south of the Debtors' house. Third, it carves a fifth lot ("Lot 5") of undeveloped land out of Lot 3 that would be accessible by Micah Drive. At trial, Mr. Kology testified that the purpose of the 1992 Subdivision Plan was to further subdivide the Property and eventually sell the individual lots.[27]

The Town of Harwich Planning Board (the "Planning Board") approved the 1992 Subdivision Plan and it was duly recorded.[28] The Debtors then cleared the trees necessary to construct Micah Drive.[29] The cul-de-sac was graded, but not paved, and utility service was added.[30] Since that time, the Town of Harwich's Tax Assessor's Office has treated Lots 3, 4, and 5 separately.[31] Indeed, the location of Lots 3 and 5 is defined at "0 Micah Drive."[32] Despite the Debtors' plan and efforts, Micah Drive has since become overgrown and is impassable.[33]

Sometime after 1994, Perry applied for a mortgage and the bank's title examination revealed a title defect.[34] By 1996, the title issue began to spawn litigation in the state courts. Perry sued the Debtors in the Barnstable Superior Court over the faulty title.[35] Although the

---

[27] Trans. June 7, 2013 at 124:11-19.

[28] Ex. 7; JPTS at ¶ 33.

[29] Trans. June 7, 2013 at 11:20-25; 12:1-3; 12:15-25; 24:18-25; 25:1-9; 26:13-15; 126:18-21.

[30] *Id.*

[31] Ex. 21.

[32] *Id.*

[33] Trans. June 7, 2013 at 11:20-25; 12:1-13; 59:10-13; Ex. 17.

[34] *Id.* at 79:15-19.

[35] *Id.* at 79:20-24; JPTS at ¶ 34. *See Perry v. Kology*, BACV1997-00205.

record does not reveal why, Cuddy also commenced an action against the Debtors in the Barnstable Superior Court in 1996.[36]  Subsequently, the Debtors, Perry, and the McGillens filed a complaint for declaratory judgment in the Probate Court seeking to confirm the Debtors' title by adverse possession.[37]

During this time period, it would be fair to say that Mr. Kology was semi-retired.  In 1992, he retired from Cape & Vineyard Electric after thirty-five years.[38]  Nevertheless, Mr. Kology ran his own landscaping and snow-blowing business from approximately 1992 until 1998.[39]  The Debtors purchased a recreational vehicle (the "Camper") around this time and began using it locally throughout Cape Cod.[40]

In 2002, the Debtors upgraded to a "fifth-wheel" style camper that consisted of a larger trailer pulled by a separate truck.[41]  Using the fifth-wheel, they began traveling extensively as "work campers" until 2010 when it was repossessed.[42]  Under this arrangement, the Debtors would work for the campground, performing such tasks as landscaping, maintenance, trash removal, and clerical work, in exchange for a free campsite with utilities.[43]  They first went to

---

[36] JPTS at ¶ 34.  *See Cuddy v. Kology*, BACV1996-00874.  Passing references in some pleadings suggest this may have been an appeal of the Planning Board's approval of the 1992 Subdivision Plan.  *See, e.g.*, "Creditor Paul J. Cuddy, Jr.'s Pre-Trial Statement," Docket No. 135 at ¶ 3.

[37] Trans. June 7, 2013 at 80:2-16; JPTS at ¶¶ 4, 34.  *See Kology et als. v. Heirs of Nickerson*, No. 99E-0062-GC-1.

[38] Trans. June 7, 2013 at 74:2-16.

[39] *Id.* at 91:17-25; 92:1-9.

[40] *Id.* at 90:4-7, 13-22; 91:7-16.

[41] *Id.* at 91:1-6.

[42] *Id.* at 92:14-25; 93:1-4; 96:1-6.

[43] *Id.* at 92:22-25; 93:1-12.

New Hampshire for ten weeks during the summer of 2002, but then headed to other sites in Florida and Alabama for the winter.[44]

The Debtors often returned to New Hampshire and had a two week timeshare there.[45] Mr. Kology registered to vote in New Hampshire, but never did so and asserts that he only registered in order to get a resident hunting and fishing license.[46] At trial, the Debtor testified that he could not recall whether he also obtained a New Hampshire driver's license.[47] The Debtors maintained a bank account in a New Hampshire bank for convenience while work-camping there, but also had accounts in Massachusetts.[48] Notwithstanding these connections to New Hampshire, the Debtors continued to file Massachusetts resident income tax returns.[49]

The record is somewhat vague on what occurred at the Property while the Debtors were traveling. Cuddy testified that he understood that the Debtors were living in New Hampshire, and were renting their house to others.[50] Mr. Kology, for his part, testified that they periodically returned to Harwich, though they seldom brought the fifth-wheel with them because Round Cove Road is unpaved and has a low tree clearance.[51] In any event, Mr. Kology credibly testified that

---

[44] *Id.* at 92:14-18; 93:13-17; 95:6-17.

[45] *Id.* at 94:14-23.

[46] *Id.* at 93:18-25; 94:1-13.

[47] *Id.* at 103:10-18; 123:9-25; 124:1.

[48] *Id.* at 97:8-20.

[49] *See* Exs. 23-29.

[50] Trans. June 7, 2013 at 55:3-6, 16-22; 56:8-13; 67:20-25; 68:1-8; 69:9-13.

[51] *Id.* at 96:11-25; 97:1-7.

the Debtors never intended to abandon their residency in Harwich and maintained ties to the

community.[52]

In 2003, the Debtors commissioned an engineer to prepare yet another plan to subdivide

the Property (the "Cluster Subdivision Plan").[53]   The Cluster Subdivision Plan, which was

admitted into evidence as Exhibit 8, is reproduced in relevant part below.[54]



---

[52] *Id.* at 95:18-20; 98:24-25; 99:1-8; 100:9-23; 101:1-18; 102:3-18; 103:5-18.

[53] Ex. 8.

[54] *Id.* (labels added).  Likely because this subdivision was immediately contested, the parties have used the prior lot descriptions from the 1990 Subdivision Plan throughout this case and I will do the same.

As is apparent from the diagram, the Cluster Subdivision Plan contemplated the extension of Micah Drive deeper into the Property and the creation of four additional lots surrounding it.[55] The Debtor submitted the Cluster Subdivision Plan to the Planning Board, but Cuddy, who by this point had "obtained deeds to all purported fractional interests in the five acre + / - 'back land,'"[56] and Marilyn Coggswell ("Coggswell"), who also asserted an ownership interest in a portion of the Property, objected. The Planning Board approved the Cluster Subdivision Plan over their objections, and Coggswell appealed the approval to the Barnstable Superior Court.[57]

Between 2005 and 2006, Cuddy obtained the remaining "purported 75% fractional interests" in the Property that were not conveyed by the Coffin Deed and Corchia Deed.[58] Meanwhile, Perry appears to have filed a second action in the state court against the Debtors and evidently obtained an execution in the amount of $22,769.92 against Lots 3, 4, and 5.[59] Ultimately, the various actions pending in the Barnstable Superior Court were consolidated into a single action before the Massachusetts Land Court that remains pending.[60]

At trial, Mr. Kology credibly testified that, except for a short hospitalization and a few overnight trips to visit family, the Debtors have spent every night in their house since the fifth-wheel was repossessed in 2010.[61] On July, 5, 2011, the Debtors recorded a form Declaration of

---

[55] Although Mr. Kology did not testify as to his intent in seeking a further subdivision of the Property, the Debtors' trial memorandum suggests that they had hoped a conveyance of some of these back lots to Cuddy would encourage a settlement of the matter. Debtors' Trial Memorandum, Docket No. 130 at 12.

[56] JPTS at ¶ 31.

[57] *See* Ex. 11. Cuddy later acquired Coggswell's interest in the disputed Property and was substituted as a plaintiff. See JPTS at ¶ 34; *Cuddy v. Kology*, BACV2004-00079.

[58] JPTS at ¶ 32.

[59] Ex. 34.

[60] JPTS at ¶¶ 5, 34. *See Kology v. Cuddy*, No. 06-MISC-336169-RBF.

[61] Trans. June 7, 2013 at 106:20-23; 107:1-9.

Elderly or Disabled Homestead pursuant to Mass. Gen. Laws ch. 188, § 2 at the Barnstable Registry of Deeds (the "Homestead Declaration").[62]  The Homestead Declaration identifies the location of the property as 57 Round Cove Road, in Harwich, Massachusetts and that their ownership derives from the Coffin Deed and the Corchia Deed.[63]  The Homestead Declaration form, which the Debtors signed under the penalty of perjury, also included a statement appearing directly after the property and title description that stated "which premises we occupy or intend to occupy as my/our principal residence."[64]

The Debtors filed a Chapter 13 petition on June 8, 2012.[65]  On Schedule A – Real Property ("Schedule A"), the Debtors listed their 25% record fee simple interest in the Property derived from the Coffin Deed and Corchia Deed with a value of $67,500.00.[66]  Additionally, they listed an equitable claim to the remaining 75% interest in the Property by adverse possession with a value of $317,500.00.[67]  On Schedule C – Property Claimed as Exempt ("Schedule C"), the Debtors claimed an exemption in both their fee simple interest portion and their equitable claim to the remainder of the Property pursuant to Mass. Gen. Laws ch. 188, § 2 to the full amount of the listed value of those interests.[68]  The Property is encumbered by the following liens:[69]

---

[62] JPTS at ¶ 27; Ex. 20.

[63] Ex. 20.

[64] *Id.*

[65] JPTS at ¶ 25.

[66] *Id.* at ¶ 28.

[67] *Id.*

[68] Schedule C, Docket No. 165.

[69] JPTS at ¶ 35.

12

| Lien Holder | Description | Date | Amount |
|---|---|---|---|
| PNC Bank, NA | First Mortgage | 4/9/2003 | $136,076.22 |
| South Eastern Economic Development Corp. | Second Mortgage | 12/10/2003 | $29,026.05 |
| Town of Harwich | Tax Lien | 6/30/2004 | $21,026.32 |
| Todd H. Perry | Judicial Lien | 3/2/2005 | $33,486.22 |
| Commonwealth Utility Employees Credit Union | Third Mortgage | 4/18/2006 | $41,829.60 |
| Unifund CCR Partners | Judicial Lien | 10/16/2006 | $24,291.12 |
| Boston Financial Corp. | Judicial Lien | 11/14/2006 | $72,583.75 |
| Town of Harwich | Tax Lien | 2/20/2008 | $35,530.01 |
| CACH, LLC | Judicial Lien | 8/28/2008 | $5,332.44 |
| Capital One Bank (USA) NA | Judicial Lien | 4/6/2010 | $1,042.56 |
|  |  | **TOTAL:** | **$400,244.29** |

Notably, of the judicial liens listed, only Perry's references both the Coffin Deed and Corchia Deed.[70] The remaining executions reference only the Corchia Deed.[71] Similarly, the 2004 tax lien only "takes" Lot 5 for nonpayment of real estate taxes, while the 2008 tax lien "takes" Lot 3.[72] The property described in each mortgage is solely Lot 4.[73]

On August 13, 2012, Perry filed the "Objection to Debtors' Homestead Exemption by Judgment Creditor, Todd H. Perry" (the "Objection to Homestead"). On August 25, 2012, the Debtors filed their memorandum in opposition. Three days later, on August 28, 2012, the Debtors filed their First Amended Chapter 13 Plan (the "Plan") wherein they proposed, *inter alia*, to avoid all judicial liens pursuant to 11 U.S.C. § 522(f) and strip off the second and third mortgages under 11 U.S.C. §§ 506(a) and 1322(b)(2) as being wholly unsecured. Both Perry and Cuddy filed objections to the confirmation of the Plan, and the Debtors have responded.

---

[70] Ex. 34.

[71] *See* Exs. 36, 37, 39, 40.

[72] *See* Exs. 33, 38.

[73] *See* Exs. 31, 32, 35.

On August 30, 2012, the Debtors filed a motion to avoid Perry's lien, to which he filed an objection on September 12, 2012.  On September 13, 2012, the Debtors filed motions to avoid the remaining judicial liens on the Property.  No responses were filed by any of the lienholders.

All these matters were separately scheduled for hearing in the ordinary course, but, in light of the common questions regarding the extent of the Debtors' homestead exemption, they were consolidated into a single contested matter.  Prior to the trial, the Debtors filed an omnibus objection to claims wherein they, *inter alia*, objected to the claims of most of the lienholders on the basis that the liens are subject to avoidance and the claims should properly be characterized as general unsecured claims.  Perry filed a response objecting to such treatment, and the objection to his claim was consolidated with the contested matter.[74]

I conducted a trial with respect to the contested matter on June 7, 2013.  In addition to Mr. Kology, Perry, and Cuddy, two other witnesses testified.  The first was Paul O'Connell ("O'Connell"), a title examiner with whom Cuddy has business dealings and who has an interest in the outcome of this case.[75]  He explained that the Property is divided into three chains of title as illustrated by the following diagram.[76]

---

[74] The objection to Southeast Development Corp., the holder of the second mortgage on Lot 4, was not consolidated with the contested matter.  Instead, it was separately continued to September 26, 2013 for an evidentiary hearing with respect to the value of Lot 4.

[75] Trans. June 7, 2013 at 30:20-23; 35:20-25; 36:1-16; 40:15-17.

[76] Ex. 12.  Because the chalk used in Ex. 12 to illustrate the different chains of title is rough hand drawn map, I have instead reproduced the purported title division lines on Ex. 7 for greater clarity.



O'Connell testified that the Debtors' 25% interest in the first title chain derives from the Coffin

Deed.[77]   According to his Title Report, there is no recorded conveyance in the second title chain

that comes forward into the Debtors, but I note that no evidence was offered to then describe

what land the Corchia Deed purports to convey.[78]   The third title chain, in turn, reflects a

recorded transfer from Coggswell, an heir of Seth Nickerson, to Cuddy.[79]  O'Connell's testimony

otherwise offered nothing more than what the parties have stipulated to—the Debtors' record

---

[77] Trans. June 7, 2013 at 34:15-23.

[78] Ex. 12.  Indeed, I have no way of knowing whether the land conveyed by the Corchia Deed is even depicted on this diagram.

[79] Id.; Trans. June 7, 2013 at 38:1-5; 43:1-3.

interest in the Property is no more than 25% and Cuddy has acquired the other 75% of the fractional interests.[80]

The second witness was David Schofield ("Schofield"), a land surveyor with decades of familiarity with the Property.[81]  Schofield, Perry, and Cuddy all testified that, based on their observations, there is no evidence that the Debtors have used any of the Property other than Lot 4 since January, 2011.[82]  Ironically, this is no more than Mr. Kology conceded, as essentially the only thing he testified to having done on the Property exclusive of Lot 4 since the end of their travels is collect broken limbs for firewood about one year ago.[83]  Indeed, Mr. Kology's testimony unambiguously places all the Debtors' use of the Property beyond Lot 4 in the past.[84]

The Debtors submitted an appraisal prepared by William F. Curley, Jr. ("Curley") wherein he concluded that the fair market value of the Debtors' 25% interest in the Property is $67,500.00.[85]  He determined that, based on a sales comparison approach, the unimpaired value of Lot 4 was $295,000.00, while Lots 3 and 5 together were worth $90,000.00.[86]  Curley then further reduced those values after considering that few buyers would be willing to purchase a fractional interest, the likelihood that a buyer could obtain financing for a fractional interest, and

---

[80] *Cf. id.* at 30-43 and Ex. 12 *with* JPTS at ¶¶ 28-32.

[81] Trans. June 7, 2013 at 44:4-5; 45:10-13, 23-25; 46:1.

[82] *Id.* at 10:13-15; 11:7-19; 20:8-23; 22:19-25; 23:1-14; 24:14-17; 28:13-16; 46:4-7, 13-20; 48:12-25; 49:1-22; 53:20-25; 54:1-18; 56:14-25; 57:1-7; 61:16-18; 63:5-13.

[83] *Id.* at 117:2-6.

[84] *Id.* at 89:16-17 (Debtors "*utilized* the land quite into the wood quite extensively" and " *had* quite a burial ground of animals"); 106:6-10 (Mr. Kology "*used* to hunt deer out there"); 113:6-8 (Mr. Kology testifying that his "old woodshed out there . . . [is] gone now"), 11-21 ("We *had* gardens out there.  We *had* plants out there."); 122:14-23 (testifying that their garden is now on Lot 4) (emphasis added).

[85] Ex. 13 at 76.

[86] *Id.*

the potential legal cost if a co-owner demands a partition.[87]   Notably, these values are substantially lower than the tax assessed values for the lots, which are $405,000.00 for Lot 4, $245,000.00 for Lot 3, and $135,000.00 for Lot 5.[88]  Neither Perry nor Cuddy offered any further evidence as to the value of the Property.

At the conclusion of evidence, I took the matter under advisement.  The parties were afforded the opportunity to file post-trial briefs, which Cuddy and Perry did.

## III. <u>POSITIONS OF THE PARTIES</u>

A. <u>Perry</u>

Perry asserts that Lot 4, the lot upon which the Debtors' house stands, has been rendered separate and distinct from the rest of the Property by repeated subdivision.  Indeed, he argues that the purported subdivisions evidence the Debtors' intent to abandon their homestead rights in the remaining land.  Alternatively, Perry contends that the evidence offered at trial demonstrates that over the forty years the Debtors have lived on the Property, their use has never extended beyond two hundred feet from the house and as such, their *de minimus* use does not meet the standard under the Homestead Statute.  Either way, he urges that I find that the Debtors' homestead exemption does not extend beyond Lot 4, or, at most, to the boundary of the Coffin Deed.

In light of his objection to the Debtors' homestead exemption, Perry opposes their motion to avoid his lien on the Property.  He further disputes the Debtors' valuation of the Property and notes that they have failed to identify the portions of the Property to which the individual liens

---

[87] *Id.*

[88] Ex. 21.

have attached.  For these same reasons, Perry also objects to confirmation of the Plan and the re-characterization of his claim as unsecured.

### B. Cuddy

Similarly, Cuddy objects to confirmation of the Plan on the basis that the Debtors are not entitled to a homestead on the Property beyond Lot 4.[89]  In support, he points to the fact that all witnesses testified that there has been no sign that the Debtors have used any part of the Property other than Lot 4 prior to or after January, 2011.  Moreover, Cuddy contends that the Debtors' actions evidence an intent to abandon the Property.  Finally, he argues that the Debtors are not entitled to "stack" their homesteads.

To the extent that the Debtors assert he lacks standing to object to confirmation, Cuddy urges that a party in interest has standing under Fed. R. Bankr. P. 4003(b) to object to the Debtors' exemption.

### C. The Debtors

The Debtors argue that they have satisfied all elements of the Homestead Statute.  They assert that the only time period relevant to assessing their homestead rights is from 2007, when they returned to the Property, to 2011, when they filed the Homestead Declaration.  As such, the Debtors contend that their prior travel does not diminish their homestead nor rise to the level of acquiring a domicile in New Hampshire.  They further note that it is particularly absurd to think that they intended to establish a permanent residence in New Hampshire when all they had to live in was a camping trailer that is unsuitable for use in the winter.

---

[89] In his objection to confirmation, Cuddy asserted that the Debtors were not entitled to a homestead on the Property because they reside in New Hampshire.  Objection of Paul J. Cuddy, Jr. to Debtors' Proposed Amended Chapter 13 Plan, Docket No. 80 at ¶¶ 4-5.  This argument appears to have been abandoned in his post-trial memorandum in favor of limiting the homestead to Lot 4.  Closing Brief of Paul J. Cuddy, Jr., Docket No. 200 at 4.

Citing *In re Edwards*[90] and *In re Fiffy*,[91] the Debtors posit that the homestead analysis requires the court to focus on the use of the contiguous land rather than its configuration.  With this in mind, they explain that the subdivision plans only concerned configuration of the lots, while their extensive actual use of the land has remained integral to their home and consistent with the minimal use test set forth in those cases.[92]  The Debtors further argue that even if they had economic intentions with respect to the Property, economic use can still be consistent with the type of use cognizable under the Homestead Statute.  By analogy, they contend that a farmer would not lose his homestead protection simply because he made a profit from growing crops on the property.

The Debtors further stress that simply "changing one's mind" as to the use of some of the land is not one of the termination methods prescribed in the Homestead Statute.  Therefore, they argue that the 1990 Subdivision Plan and the Cluster Subdivision are irrelevant because the title litigation has prevented the sale of any of the lots and stymied any intentions they had unless they prevail in the Land Court.  Moreover, the Debtors emphasize that the Homestead Declaration post-dates both subdivisions and that the Homestead Declaration itself evidences their intention to continue to occupy the Property as their homestead.  Furthermore, the Debtors rely on *Marinelli v. Board of Appeal of Stoughton*[93] for the proposition that common ownership merges individual lots into one if subsequent zoning changes affect the buildability of the lots.

---

[90] *In re Edwards*, 281 B.R. 439 (Bankr. D. Mass. 2002).

[91] *Fiffy v. Nickless (In re Fiffy)*, 293 B.R. 550 (B.A.P. 1st. Cir. 2003).

[92] As the unrebutted testimony establishes that the Debtors' past use of the Property exceeded the boundaries of Lot 4, I need not dwell on the individual activities.

[93] *Marinelli v. Board of Appeal of Stoughton*, 440 Mass. 255 (2003).

Next, the Debtors assert that Perry's reliance on the tax assessed value of the Property is misplaced because only Curley's appraisal takes into account that the fair market value of the Property is impaired by the cloud on title. They contend that even if their equitable title to the other 75% interest in the Property is counted, the value of the Property would be seriously depressed by the litigation. In any event, the Debtors argue that the issue may be academic because the express provisions of Mass. Gen. Laws ch. 188, § 1 state that each person benefited by a homestead declared pursuant to Mass. Gen. Laws ch. 188, § 2, as theirs was, is entitled to the declared homestead without reduction, proration, or allocation. Therefore, the Debtors may claim an exemption in the aggregate amount of $1,000,000.00, which far exceeds either valuation.

Finally, the Debtors contend that Cuddy lacks standing to object to confirmation of the Plan because he is not a creditor.

## IV. DISCUSSION

### A. Objection to the Debtors' Homestead Exemption

"Under 11 U.S.C. § 522(b), 'an individual debtor may exempt from property of the estate the property listed in . . . paragraph (3) of this subsection,' which allows a debtor to claim the exemptions provided for under applicable state law."[94] Here, the Debtors have claimed an exemption under the Mass. Gen. Laws ch. 188, § 2(a), which provides in relevant part:

> The estate of homestead of each owner who is an elderly or disabled person, regardless of marital status, shall be protected under this section against attachment, seizure, execution on judgment, levy and sale for payment of debts and legacies, except as provided in subsection (b) of section 3, to the extent of the declared homestead exemption; provided, however, that the declaration of homestead for such elderly or disabled person that complies with section 5 has

---

[94] *In re Andris*, 471 B.R. 761, 765 (Bankr. D. Mass. 2012). *See Gordon v. Pappalardo (In re Gordon)*, 487 B.R. 600, 602 (B.A.P. 1st Cir. 2013); *In re Feliciano*, 487 B.R. 47, 50 (Bankr. D. Mass. 2013).

been recorded; and *provided, further, that each owner occupies or intends to occupy the home as his principal residence*.[95]

The statute defines a "principal residence" as "the home where an owner . . . resides or intends to reside as the primary dwelling; provided, however, that no person shall hold concurrent rights in more than 1 principal residence."[96]  A "home," in turn, "is the aggregate of . . . a single-family dwelling, including accessory structures appurtenant thereto and *the land on which it is located*. . . ."[97]  Finally, an "elderly person" is "an individual 62 years of age or older," while an "owner" is "a natural person who is a sole owner, joint tenant, tenant by the entirety, tenant in common, life estate holder or holder of a beneficial interest in a trust."[98]  Mass. Gen. Laws ch. 188, § 2(a) continues by stating that:

> An owner of a home who qualifies under this section shall, upon recording of an elderly or disabled person's declaration of homestead protection, be eligible for protection of such ownership interest to the extent of the declared homestead exemption as set forth in clauses (3) and (4) of the definition of "declared homestead exemption" in section 1 regardless of whether such declaration is recorded individually or jointly with another.[99]

Clause (3) of the definition of a "declared homestead exemption" contained within Mass. Gen. Laws ch. 188, § 1 includes:

> an exemption in the amount of $500,000 created by a written declaration, executed and recorded pursuant to section 5; provided, however, that . . . each person who owns a home and who is benefited by an estate of homestead declared pursuant to section 2 shall be entitled to the declared homestead exemption without reduction, proration or allocation among other owners of the home . . .[100]

---

[95] Mass. Gen. Laws ch. 188, § 2(a) (emphasis added).

[96] Mass. Gen. Laws ch. 188, § 1.

[97] *Id.* (emphasis added).

[98] *Id.*

[99] Mass. Gen. Laws ch. 188, § 2(a).

[100] Mass. Gen. Laws ch. 188, § 1.  Clause (4) applies in cases where two owners declare separate estates of homestead pursuant to § 2 and § 3 of Mass. Gen. Laws ch. 188.  As such, it does not apply to the case.

Under 11 U.S.C. § 522(l), exemptions listed on Schedule C are presumptively valid in the absence of an objection.[101]  Therefore, Fed. R. Bankr. P. 4003(c) places the burden to prove that an exemption is not properly claimed on the objecting party.[102]  Nevertheless,

> [i]f the objecting party can produce evidence to rebut the exemption, the burden of production then shifts to the debtor to come forward with *unequivocal evidence* to demonstrate that the exemption is proper . . . the burden of persuasion, however, always remains with the objecting party.[103]

I must also remain mindful that the "Massachusetts homestead exemption is to be liberally construed in favor of the declarant"[104] and try to predict how the Massachusetts Supreme Judicial Court would rule.[105]

Turning to the facts at hand, it is undisputed that the Debtors satisfy many of the requirements under the Massachusetts Homestead Statute.  First, they are "elderly person[s]" and, even with only a fractional interest in the Property, they are still "owners" as that term is defined.  Next, the Debtors' house is unquestionably a "home," and the evidence clearly establishes that the Debtors have occupied and intended to occupy their house as a principal residence since at least 2010 when the fifth-wheel was repossessed.[106]

---

[101] 11 U.S.C. § 522(l) ("Unless a party in interest objects, the property claimed as exempt on such list is exempt.").

[102] Fed. R. Bankr. P. 4003(c).  *See Shamban v. Perry (In re Perry)*, 357 B.R. 175, 178 (B.A.P. 1st Cir. 2006).

[103] *Carter v. Anderson (In re Carter)*, 182 F.3d 1027, 1029 n.3 (9th Cir. 1999) (emphasis added).  *See In re Genzler*, 426 B.R. 407, 418 (Bankr. D. Mass. 2010); *In re Toppi*, 378 B.R. 9, 11 (Bankr. D. Me. 2007); *In re Roberts*, 280 B.R. 540, 544-545 (Bankr. D. Mass. 2001).

[104] *In re Genzler*, 426 B.R. at 418; *see Shamban v. Masidlover*, 429 Mass. 50, 53 (1999); *Dwyer v. Cempellin*, 424 Mass. 26, 30 (1996).

[105] *See Garran v. SMS Financial V, LLC (In re Garran)*, 338 F.3d 1, 6 (1st Cir. 2003); *Caron v. Farmington Nat'l Bank (In re Caron)*, 82 F.3d 7, 9 (1st Cir.1996); *Hildebrandt v. Collins (In re Hildebrandt)*, 320 B.R. 40, 44 (B.A.P. 1st Cir. 2005); *In re Desroches*, 314 B.R. 19, 21-22 (Bankr. D. Mass. 2004); *In re Miller*, 113 B.R. 98, 101 (Bankr. D. Mass. 1990).

[106] I say "since at least 2010" because all the Massachusetts Homestead Statute requires is a manifestation of intent at the time the homestead is declared.  *See In re Marrama*, 307 B.R. 332, 337 (Bankr. D. Mass. 2004) (requisite

The heart of this dispute is the extent to which the Property is "the land on which [the Debtors' primary dwelling] is located" and is occupied as such.[107]  Putting aside the definitional hopscotch required to frame the issue utilizing the statutory terms, the question ultimately boils down to use—was the land, i.e., the entire Property, used and occupied as part of the Debtors' principal residence.[108]   An owner's "intent to occupy" has always been the central inquiry mandated by the Massachusetts Homestead Statute, but this particular iteration of the analysis traditionally has been applied when an owner claims that the homestead consists of more than one parcel of land which may, in some cases, be vacant.[109]  By focusing on actual use and occupancy, courts ensure that exemptions will be construed in a manner consistent with the purpose and policy of the Massachusetts Homestead Statute.[110]  With these principles in mind, cases such as *In re Fiffy* and *In re Edwards* suggest that the requisite "use" for vacant land to fall within the homestead is a fairly low threshold and includes: storage; landscaping; gardening; sheltering of animals and livestock; cultivation; recreation; maintaining privacy; guarding against future development; and other personal purposes.[111]

---

intent must exist at the time of the filing of the declaration); *In re Webber*, 278 B.R. 294, 297 (Bankr. D. Mass. 2002) (the statutory requirement of occupy or intent to occupy is only applicable at the time of the filing of the declaration).  In the absence of the fifth-wheel, there really is no dispute that the Debtors returned to the Property with the intent to live there as their *only* residence.  That said, the evidence put forth at trial did not otherwise support a finding that the Debtors intended to establish a domicile in New Hampshire prior to their Homestead Declaration.

[107] Mass. Gen. Laws ch. 188, § 1.

[108] *See In re Fiffy*, 293 B.R. at 555; *In re Edwards*, 281 B.R. at 447.  Although the Massachusetts Homestead Statute was substantially revised in 2010, the statute uses largely the same definitions and preserves most of the same core concepts making earlier cases still relevant.

[109] *In re Fiffy*, 293 B.R. at 555; *In re Edwards*, 281 B.R. at 447; *see also  Backus v. Chapman*, 111 Mass. 386 (1873); *Perkins v. Jewett*, 93 Mass. 9 (1865); *Adams v. Jenkins*, 82 Mass. 146 (1860); *Aldrich v. Gaskill*, 64 Mass. 155, 157 (1852); *Taylor v. Mixter*, 28 Mass. 341, 347 (1831).

[110] *Dwyer v. Cempellin*, 424 Mass. at 29 ("Homestead laws are based on a public policy which recognizes the value of securing to householders a home for the family regardless of the householder's financial condition.").

[111] *In re Fiffy*, 293 B.R. at 556; *In re Edwards*, 281 B.R. at 450.

No one disputes that at least Lot 4, the subdivided lot upon which the Debtors' house sits, qualifies for homestead protection. Instead, Perry and Cuddy only contest the Debtors' claim that their homestead exemption extends to the entire Property. The record establishes that between 1969 and 1990, the Debtors engaged in the types of sufficient uses identified by *In re Fiffy* and *In re Edwards* beyond the boundaries of what would later become Lot 4.[112] Admittedly, their activities in most cases, but not all, presented only a *de minimus* encroachment of a few hundred feet onto Lots 3 and 5. Nevertheless, given that all witnesses familiar with the Property testified that it is densely wooded and not easily traversed, I find that the Debtors' actual use of the Property *at this point in time* was reasonable and in connection to their principal residence.

The inquiry, however, does not end there. In both 1992 and 2003, the Debtors sought and obtained approval of plans subdividing the Property into individual additional lots. Critically, the 1992 Subdivision Plan in particular created Lot 4 by essentially carving out the land surrounding their house from the rest of the Property. The Debtors' stated intention for subdividing was to facilitate the eventual sale of the subdivided lots. It is also significant that they did more than simply record the plan. Indeed, the Debtors undertook substantial efforts in an attempt to realize their plan as evidenced by the clearing and grading of Micah Drive.[113] Furthermore, the record suggests that the title litigation, rather than any change of heart, ultimately delayed their plans. "As in other areas of the law, intent, though elusive, may nonetheless be discerned in and, established by, words and actions divined for their true meaning

---

[112] The activities themselves are not in dispute and, for reasons set forth more fully below, are immaterial to the outcome of this case. Therefore, it is enough to say that they are sufficient under the case law.

[113] *Cf. In re Edwards*, 281 B.R. at 450 (debtor's statement that he considered giving the contiguous vacant lot to his daughter to build a house "someday," without more, was speculative and, in view of the physical implausibility of the idea, insufficient to exclude the lot from the homestead).

rather than their facial form."[114]   In sum, the Debtors' actions with respect to the subdivisions are substantial evidence that they intended to alienate the Property beyond Lot 4 rather than occupy it in connection with their principal residence.

The present fact pattern actually presents an opposite scenario from *In re Edwards* and *In re Fiffy*.   In both of those cases, the debtors separately acquired vacant lots which were contiguous to the lots upon which their homes sat.[115]   Both lots were ultimately found to be entitled to homestead protection because the debtors' subsequent use of them was integral to their principal residences such as to effectively merge the separate parcels.[116]   In this case, the Debtors have essentially done the opposite by creating an objective division in the Property through subdivision.[117]

Notwithstanding these facts, the requisite intent under the Massachusetts Homestead Statute must exist at the time of the declaration; here, July 5, 2011.[118]   The Debtors argue that the recording of the Homestead Declaration "declared that they then occupied or intended to occupy the land as their homestead, as they had done in the past."[119]   Homestead declarations, by

---

[114] *In re Tofani*, 365 B.R. 338, 345 (Bankr. D. Mass. 2007).  *See In re Genzler,* 426 B.R. at 421 (contrary to debtor's assertions, evidence reflected that the debtor neither occupied the property as a principal residence nor reasonably intended to return in the future); *In re Webber*, 278 B.R. at 298 ( "Specific intent . . . is hidden in the mind of the homestead owner, may not be clear even to him or her, and can change back and forth; it often leaves no public record of itself.").

[115] *In re Fiffy*, 293 B.R. at 551-552; *In re Edwards*, 281 B.R. at 441.

[116] *In re Fiffy*, No. 02-40536, Slip Op. (Bankr. D. Mass. Oct. 29, 2003) (on remand); *In re Edwards*, 281 B.R. at 450-451.

[117] I recognize that the Debtors did acquire the Property through multiple deeds and, in line with my prior findings, used it in a manner consistent with the Massachusetts Homestead Statute between 1969 and 1990.  Their subsequent behavior is the issue.

[118] *In re Melito*, 357 B.R. 684, 687 (Bankr. D. Mass. 2007); *In re Marrama*, 307 B.R. at 337; *In re Webber*, 278 B.R. at 297.

[119] Debtors' Trial Memorandum RE: Objections to Claim of Homestead Exemption and Confirmation, Docket No. 130 at 10.

themselves, are not conclusive evidence of intent.  Indeed, a mere attestation of a fact under the penalty of perjury does not make it true.  Perry and Cuddy are entitled to dispute that declaration and compel the Debtors to corroborate their claim.  Surprisingly, no one at trial specifically asked either Debtor what their intent was with respect to Lots 3 and 5 at the time they recorded the Homestead Declaration.  It is particularly notable that the Debtors' own counsel did not elicit such testimony from Mr. Kology after introduction of the subdivision plans and his admission that they were prepared with an eye towards selling.  As such, I am left to draw reasonable inferences as to their intent based on the totality of the circumstances.

The evidence clearly establishes that the Debtors occupy their house, which is located on Lot 4, as a principal residence.  Unfortunately, the only evidence of their use or intent with respect to Lots 3 and 5 after 2003 is that Mr. Kology once, approximately one year before the trial, scavenged the lots for broken branches to fuel his woodstove.  The recurring theme of his testimony was that all "extensive" and regular use of the Property beyond Lot 4 ceased long ago. Particularly where the Debtors' intervening conduct manifested a clear intent which was at odds with an intent to occupy Lots 3 and 5 in connection with the principal residence, they are not entitled to rely on their pre-subdivision use and conduct to establish the requisite intent at the time of the Homestead Declaration.  Admittedly, the Debtors allowed Micah Drive to become overgrown and impassable, but I find it likely that occurred as a result of their dreams of subdivision and sale being forced into limbo by the title litigation, rather than an abandonment of their intent to sell.

Perhaps aware of the dearth of evidence of their intent at the time of the Homestead Declaration, the Debtors offer a plethora of reasons why the 1992 Subdivision Plan and the Cluster Subdivision Plan are insignificant in order to cling to their past sufficient use of the

Property.  First, they stress that the case law focuses on use, not configuration, and argue that while the subdivisions altered the configuration of the Property, their use remained constant. While the statement of law is correct, the Debtors' conclusions are inconsistent with the facts. The 1992 Subdivision Plan and the Cluster Subdivision Plan did more than alter the configuration of the Property.  They evidenced intent to alienate portions of the Property from their residential lot.  Moreover, I reiterate that there is little to no evidence that the Debtors continued to use Lots 3 and 5 after 2003.

Second, the Debtors contend that subdivision for sale was simply an economic or business use of the Property that is not proscribed by the Massachusetts Homestead Statute.  In support, they note that farmer would not lose his homestead rights simply by growing crops for profit on his homestead.  The analogy is completely inapt.  The proposed "economic" use contemplated by the Debtors' subdivisions is the alienation of the Property for profit.  The alienation of land, for whatever reason, is wholly incompatible with using it as a principal residence.

Third, the Debtors assert that once acquired, a homestead can only be terminated by one of the acts set forth in Mass. Gen. Laws ch. 188, § 2(b).[120]  Changing one's mind as to the use of some land, they emphasize, is not an act of termination unless it is extreme enough to rise to the level of abandonment of the principal residence.  This argument misses the mark as it assumes

---

[120] Mass. Gen. Laws ch. 188, § 2(b) provides in relevant part:

> Except as provided in the following paragraph, each elderly or disabled person's estate of homestead shall terminate upon: (i) the sale or transfer of that person's ownership interest in the home, except where the elderly or disabled person is also the transferee of all or a portion of the transferred interest; (ii) the recorded release of that person's homestead estate; (iii) the subsequent declaration of an estate of homestead on other property; (iv) the abandonment of the home as the principal residence by the person; (v) the death of the person; or (vi) with respect to a home owned in trust, the execution of a deed or recorded release by the trustees.

Mass. Gen. Laws ch. 188, § 2(b).

that they had already acquired a homestead exemption as to the entire Property due to their usage prior to the 1992 Subdivision Plan.  To the contrary, they acquired their homestead on July 5, 2011, long after they separated their residence from the remainder of the Property.[121]  Moreover, the 1992 Subdivision Plan and the Debtors' efforts to effectuate it, as evidenced by the clearing and grading of Micah Drive and installation of utilities, demonstrates a palpable change of mind.

Fourth, the Debtors rely on *Marinelli v. Board of Appeal of Stoughton* for the proposition that when subsequent zoning changes affected their ability to build on the subdivided lots, their common ownership of all the subdivided lots caused a merger such that the land transformed back into a single lot.[122]  Specifically, they argue that zoning changes over the years have increased the square footage requirement for a buildable lot from 40,000 to 50,000, rendering the subdivided lots insufficient.[123]  Nevertheless, there is no evidence in the record of such a change to the applicable zoning regulations.  To the contrary, agreed Exhibit 16, which is the zoning area regulations for the Town of Harwich, indicates that 40,000 square feet is sufficient for all single family use.[124]

Fifth and finally, the Debtors assert that the title litigation stifled all subdivision plans, past and present, effectively putting them back to square one.  Moreover, they stress that unless they obtain a favorable result in the title litigation, the 1992 Subdivision Plan and the Cluster Subdivision Plan will be rendered nullities.  While I agree that the "thick cloud over the title . . .

---

[121] The Debtors did not argue that they acquired an "automatic homestead exemption" under Mass. Gen. Laws ch. 188, § 1 when the revised statute went into effect on March 16, 2011.  Even if they had, the face the same problem—the 1992 Subdivision Plan is an intervening event between their past qualifying usage and the acquisition of the homestead.

[122] *Marinelli v. Board of Appeal of Stoughton*, 440 Mass. 255 (2003).

[123] Debtors' Trial Memorandum RE: Objections to Claim of Homestead Exemption and Confirmation, Docket No. 130 at 13.

[124] Ex. 16.

incontrovertibly halts any prospect of the Kologys to sell off a lot shown on any of the subdivisions" for the time being, that is simply not dispositive of their intent.[125]  In fact, their present inability to sell any subdivided lots says absolutely nothing about what their intent was with respect to the entire Property at the time they recorded the Homestead Declaration.  Put simply, just because the Debtors could not sell in July of 2011, it does not necessarily follow that they abandoned their intent to sell.  The Debtors maintain that they have an equitable claim to the 75% interest in the Property and continue to prosecute the Land Court action.  If they believe that acquisition of clear title is probable, then a sale is not off the table.

In sum, Perry and Cuddy introduced irrefutable evidence that, prior to the Homestead Declaration, the Debtors intended to alienate the Property.  As such, they have successfully rebutted the presumption that the homestead as claimed is proper.  In the face of such compelling evidence, the burden shifted to the Debtors to produce *unequivocal* evidence to the contrary.[126] They failed to do so.  In fact, the record is almost entirely devoid of any circumstantial evidence, let alone direct testimony, to corroborate their (form) assertion in the Homestead Declaration that on July 5, 2011, the Debtors intended to occupy the Property in its entirety as a principal residence.  Therefore, I find that the Debtors have only demonstrated the requisite intent with respect to Lot 4 and, as such, their homestead exemption must be so limited.  Accordingly, Perry's objection to their exemption must be sustained.

### B. Lien Avoidance Pursuant to Section 522(f)

Having determined the extent of the Debtors' homestead exemption, I may now turn to their motions to avoid judicial liens.  Pursuant to 11 U.S.C. § 522(f), a debtor may avoid the

---

[125] Debtors' Trial Memorandum RE: Objections to Claim of Homestead Exemption and Confirmation, Docket No. 130 at 14.

[126] *In re Carter*, 182 F.3d at 1029 n.3.

fixing of a judicial lien "on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled. . . ."[127]  From the outset, the Debtors have a problem—I have already held that they are only entitled to a homestead exemption with respect to Lot 4 which, according to O'Connell's unrebutted testimony, derives solely from the Coffin Deed.  The executions of Unifund CCR Partners, Boston Financial Corp., CACH, LLC, and Capital One Bank (USA) NA only attached to the interest granted to the Debtors by the Corchia Deed.  As such, they cannot be said to impair an exemption to which the Debtors would have been entitled.  Thus, the Debtors' motions to avoid those liens must be denied.[128]

Perry's execution, on the other hand, attached to the interests granted to the Debtors by both the Coffin Deed and the Corchia Deed, leaving open the possibility that it is at least avoidable as to Lot 4.  Lot 4 is subject to the following liens:

| Lien Holder | Description | Date | Amount |
|---|---|---|---|
| PNC Bank, NA | First Mortgage | 4/9/2003 | $136,076.22 |
| South Eastern Economic Development Corp. | Second Mortgage | 12/10/2003 | $29,026.05 |
| Todd H. Perry | Judicial Lien | 3/2/2005 | $33,486.22 |
| Commonwealth Utility Employees Credit Union | Third Mortgage | 4/18/2006 | $41,829.60 |

Because the Debtors each own their "home" and benefit from an estate of homestead declared pursuant Mass. Gen. Laws ch. 188, § 2, they are each entitled to a declared homestead exemption in the amount of $500,000.00 "without reduction, proration or allocation among other owners of

---

[127] 11 U.S.C. § 522(f)(1).

[128] I note that because the Debtors received something from the Corchia Deed, these liens clearly attached to something, although specifically what is not in the record.

the home."[129]  This means the "amount of the exemption that the debtor could claim if there were

no liens on the property" is $1,000,000.00.[130]

Section 522(f)(2)(A) of the Bankruptcy Code provides the following formula to

determine whether a debtor's exemption is impaired:

> For the purposes of this subsection, a lien shall be considered to impair an
> exemption to the extent that the sum of --
>> (i) the lien;
>> (ii) all other liens on the property; and
>> (iii) the amount of the exemption that the debtor could claim if there were
>> no liens on the property;
> exceeds the value that the debtor's interest in the property would have in the
> absence of any liens.[131]

Applying the formula to Perry's lien, the sum of Perry's lien ($33,486.22), all other liens on Lot

4 ($136,076.22 + $29,026.05 + $41,829.60 = $206,931.87), and the homestead exemption that

they could claim in the absence of liens ($1,000,000.00) is $1,240,418.09.  The final question is

whether that exceeds the value of the Debtors' interest in Lot 4 in the absence of any liens.

At trial, the Debtors offered Curley's appraisal as evidence of the depressed value of their

interest in the Property.  In it, Curley opined that the unimpaired value of Lot 4 was $295,000.00,

but then further reduced that value due to cloud on title.[132]  In contrast, the Town of Harwich has

assessed the value of Lot 4 at $405,000.00, which Perry asserts demonstrates that Curley's value

is understated.[133]  Perry further takes issue with the Debtors' attempt to only count the value of

---

[129] Mass. Gen. Laws ch. 188, § 1.

[130] 11 U.S.C. § 522(f)(2)(A)(iii).

[131] 11 U.S.C. § 522(f)(2)(A).

[132] Ex. 13 at 76.

[133] Ex. 21.

their 25% record interest, arguing that they ought to use 100% of the value of Lot 4 because they maintain they have an equitable claim to the remaining 75% interest.

Given the Debtors' ability to stack their exemptions, the dispute as to the value of Lot 4 is largely academic, and I need not make a definitive finding as to its value at this time. Assuming, *arguendo*, that I conclude that the value of Lot 4 is $405,000.00 and agree that the Debtors must count their alleged equitable interest in addition to their record interest, which is the most Perry could ask for without having introduced a higher appraisal of his own, the sum of all the liens and their homestead exemption would still far exceed the value of their interest in Lot 4. Under this scenario, the impairment would be in the amount of $835,418.09, rendering Perry's lien wholly avoidable as to Lot 4. Therefore, I will grant the Debtors' motion to avoid Perry's lien, but only to the extent that it impairs their homestead exemption in Lot 4 and not beyond.

C. The Debtors' Objection to Claim #9

In light of the Debtors' then pending motion to avoid Perry's lien, they objected to Perry's proof of claim to the extent that it purported to be secured and recommended that the claim be re-characterized as a general unsecured claim. Because I have held that Perry's lien is avoidable only as to Lot 4, Perry's lien remains secured by the balance of the Debtors' interest in the Property granted by the Coffin Deed and the entirety of their interest granted by the Corchia Deed. Thus, the objection is ill-taken and will be overruled.

D. The Objections to Confirmation

Perry's objection to confirmation was largely based upon his objection to their homestead exemption. He asserted, among other things, that the Debtors incorrectly valued the Property, failed to individually value the subdivided lots, incorrectly valued their interest in both of the lots and the Property, and as such, were not proposing to pay the full liquidation value of the

32

Property through the Plan.  Cuddy also filed an objection to confirmation which only alleged that the Debtors were not entitled to exempt the Property as a whole.[134]

Based on my rulings herein, the Debtors must amend the Plan.  As it currently stands, the Debtors propose to treat their lien creditors as general unsecured claimants under the assumption that the liens were avoidable under 11 U.S.C. § 522(f).  They were not, and now that treatment is inappropriate.  Furthermore, with the Debtors' homestead exemption being limited to Lot 4, they must amend the liquidation analysis to reflect that Lots 3 and 5 are not exempt.

Because other parties have also objected to the Debtors' valuation of the Property and a valuation hearing has already been scheduled with respect to at least one other creditor, I will consolidate my consideration of the value of the Property and its component lots with that proceeding.  Nevertheless, for the reasons stated above, I will sustain the objections to the Plan.

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter orders:

1. Sustaining the "Objection to Debtors' Homestead Exemption by Judgment Creditor, Todd H. Perry;"[135]

2. Granting in part and denying in part the "Debtors' Motion to Avoid Judicial Lien of Todd H. Perry Pursuant to 11 U.S.C. §522(f);"[136]

3. Denying the "Debtors' Motion to Avoid Judicial Lien of Boston Financial Corporation Pursuant to 11 U.S.C. §522(f);"[137]

---

[134] The Debtors assert that Cuddy lacks standing to object to confirmation because he is neither a creditor nor a party in interest.  Cuddy asserts that Fed. R. Bankr. P. 4003(b) grants him standing to object to the Debtors' claim of exemptions, but that is not what he filed.  Nevertheless, 11 U.S.C. § 1324(a)  permits a party in interest to object to confirmation of a Chapter 13 plan.  Cuddy argues that he is such a party in interest because he has a direct financial stake in the case, but I find such a proposition doubtful.  He is not a creditor and the Plan does not contemplate upsetting his property rights.  His rights will be determined in the Land Court.  That said, his objection, whether it be to confirmation or the homestead exemption, asserts no more than Perry's objections did, rendering it superfluous.  Therefore, I find the question of his standing moot.

[135] Docket No. 15.

[136] Docket No. 31.

[137] Docket No. 59.

4. Denying the "Debtors' Motion to Avoid Judicial Lien of CACH, LLC Pursuant to 11 U.S.C. §522(f);"[138]

5. Denying the "Debtors' Motion to Avoid Judicial Lien of Capital One Bank (USA) NA Pursuant to 11 U.S.C. §522(f);"[139]

6. Denying the "Debtors' Motion to Avoid Judicial Lien of Unifund CCR Partners Pursuant to 11 U.S.C. §522(f);"[140]

7. Sustaining the "Objection of Judgment Creditor, Todd H. Perry, to Confirmation of Debtors' First Amended Chapter 13 Plan;"[141]

8. Sustaining the "Objection of Paul J. Cuddy, Jr. to Debtors' Proposed Amended Chapter 13 Plan;"[142] and

9. Overruling the "Debtors' Objection to Claims and Notice to Claimants"[143] with respect to Claim #9.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: September 24, 2013

Counsel Appearing:

Michael J. Tremblay, Law Office of Michael J. Tremblay, Marlborough, MA,
    for the Debtors
J. Alexander Watt, Law Office of J. Alexander Watt, Barnstable, MA,
    for Todd H. Perry
Anthony T. Panebianco, Wynn & Wynn P.C., Raynham, MA,
    for Paul Cuddy

---

[138] Docket No. 60.

[139] Docket No. 61.

[140] Docket No. 62.

[141] Docket No. 76.

[142] Docket No. 80.

[143] Docket No. 172.